UNITED STATES of America

v.

Jermaine BONEY, Appellant.

UNITED STATES of America

v.

Donald A. HOLLOMAN, Appellant.

Nos. 90–3270, 90–3281.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 6, 1992.

Decided Oct. 13, 1992.

Barbara McDowell (appointed by this court), with whom James E. Anklam, Washington, D.C., was on the brief, for appellant Jermaine Boney in 90–3270. Timothy B. Dyk, Washington, D.C., also entered an appearance, for appellant.

Mona Asiner, Alexandria, Va. (appointed by this court), for appellant Donald A. Holloman in 90–3281.

Kristan Peters–Hamlin, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before: SILBERMAN, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Opinion dissenting in part and concurring in part filed by Circuit Judge RANDOLPH.

SILBERMAN, Circuit Judge:

Appellants Donald Holloman and Jermaine Boney appeal their drug trafficking convictions. Both were convicted under 21 U.S.C. § 841(a) for distribution of cocaine, and one, Boney, was also convicted of possession of 12.72 grams of cocaine. Boney claims that the district court erroneously permitted an expert witness to testify as to his guilt. Holloman objects to the district court's failure to give an identification instruction to the jury and contends that the court improperly considered for sentencing purposes the very 12.72 grams of cocaine involved in the possession charge of which he was acquitted. Both appellants assert that their Sixth Amendment right to an impartial jury was violated because after trial it was discovered that one of the jurors was a convicted felon. We affirm on all issues except the Sixth Amendment juror bias claim. We remand for the district court to hold a hearing into actual bias.

### I.

Shortly after midnight on September 12, 1989, an undercover officer of the Metropolitan Police Department, Darrell Young, approached Jeffrey Marks and sought to buy twenty dollars worth of crack cocaine. Marks asked appellant Donald A. Holloman, who was standing a short distance away, to "serve" Investigator Young. Holloman replied that he might not have enough. Marks thereupon called to appellant Jermaine Boney, who was also standing nearby, and told him to "break ... a piece off the rock." Boney walked to a pickup truck, reached down behind the rear tire, and retrieved a plastic bag which held what Young described as a large off-white rock. Holloman then said that he had enough for the transaction and gave Investigator Young .199 grams of cocaine base of 84% purity. Young, in exchange, gave Holloman a twenty dollar bill with a prerecorded serial number.

After returning to his car, Young radioed members of his arrest team to move in and told them that Holloman was walking toward a nearby gas station. As they approached, one of the arresting officers saw Boney throw a plastic bag under the pickup truck. Another officer retrieved the bag, which contained 12.72 grams of cocaine base of 69% purity. Boney and Marks were arrested at the scene of the sale. Holloman was arrested while standing at the cashier's window in the nearby gas station. Holloman and the cashier were the only people at the station, and the premarked twenty dollar bill was on the counter in front of Holloman. Young identified all three suspects at the scene of the arrest.

Marks, Holloman, and Boney were tried before a jury for distributing the .199 grams of cocaine purchased by Investigator Young and for possessing with intent to distribute the 12.72 grams of cocaine found under the truck. The government introduced expert testimony from Officer David Stroud, who testified concerning the roles and behavior of participants in drug trafficking operations. The government put to Stroud an elaborate hypothetical involving three people performing exactly the same actions as the defendants in this case, in exactly the same location, using the same words, and even the same amounts of cocaine. Stroud testified that the scenario suggested to him a common pattern for a cocaine sale; he gave his opinion on who in the described operation was a "runner," who was a "holder," and who "was going to actually make the sale."

Officer Young, who also testified about the transaction, was cross-examined concerning his ability to see Holloman at night and about his later identification of Holloman. In closing argument, Holloman's counsel pressed the theory that Holloman had been misidentified at the time of the arrest. The court, however, declined to give the jury an instruction describing the difficulties often involved in identification testimony and emphasizing that the government must establish the defendants' identification beyond a reasonable doubt.

The jury, rather puzzlingly, acquitted Marks on both counts, convicted Holloman only of distribution of the .199 grams of cocaine (he was acquitted of possession of the 12.72 grams that police found under the

pickup truck), and convicted Boney of both offenses. After the verdict had been returned, but before sentencing, Holloman's counsel received a tip that the foreman of the jury was a convicted felon. An investigation by the prosecutor confirmed that the foreman had been convicted of grand theft and taking a vehicle without consent in California and had been arrested for larceny in Arizona. Boney and Holloman claimed that the felon's presence on the jury had violated their Sixth Amendment rights, and they moved for a new trial. The court denied their motion.

Even though Holloman had been acquitted of the possession charge, the court calculated both Boney's and Holloman's sentences by aggregating the weight of drugs involved in both counts (.199 grams on the distribution count and 12.72 grams on the possession count). Under the Sentencing Guidelines, that amount of drugs produces a sentencing range of 63–78 months for each defendant. The district court sentenced Boney to 78 months, but gave Holloman credit for accepting responsibility and sentenced him to 63 months.

Boney and Holloman appeal their convictions. Boney contends that Officer Stroud's expert testimony was inadmissible because it was both unhelpful to the jury under FED.R.EVID. 702 and unduly prejudicial under FED.R.EVID. 403. Holloman charges that the court erred in refusing to instruct the jury on the issue of identification. Both claim that the presence of a felon on the jury violated the Sixth Amendment and requires a new trial. Finally, Holloman also argues that the district court violated the Due Process and Double Jeopardy Clauses of the Fifth Amendment by calculating his sentence based on the

weight of drugs involved in a count on which he was acquitted.

## II.

We turn first to Boney's challenge to the expert testimony of Officer Stroud. According to Boney, the hypothetical presented by the prosecutor so closely mirrored the facts in this case that by assigning roles to the individuals in the hypothetical, Officer Stroud essentially gave his opinion that Boney and Holloman were playing those roles in a cocaine sale. Boney asserts that such testimony was not helpful to the jury as required by FED.R.EVID. 702 and that it was unduly prejudicial under FED.R.EVID. 403.

 We consider appellant's arguments under Rule 702 and Rule 403 separately because only the Rule 702 objection was preserved at trial.[1] The district court's admission of the expert testimony under Rule 702 is subject to reversal only for abuse of discretion. *See United States v. Dunn,* 846 F.2d 761, 763 (D.C.Cir.1988).[2] Rule 702 permits expert testimony that "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." FED.R.EVID. 702. Under that requirement that expert testimony "assist" the jury (usually referred to as the "helpfulness" requirement), testimony should ordinarily not extend to matters within the knowledge of laymen. Officer Stroud's testimony certainly did not do so. The operations of narcotics dealers repeatedly have been found to be a suitable topic for expert testimony because they are not within the common knowledge of the average juror. *See, e.g., United States v.*

**1.** Contrary to the government's assertion, Boney's counsel did raise an objection under Rule 702 at trial. Before Officer Stroud began to testify, Boney's counsel protested that "you really don't need an expert. There is nothing complicated in this case...." He also objected to testimony concerning the defendants' "roles and so forth." Finally, he objected to the government's detailed hypothetical after the prosecutor had described it but before Officer Stroud had answered. These objections were sufficiently specific, *see* FED.R.EVID. 103, to alert the district court and opposing counsel that appellant's

counsel considered expert testimony unhelpful to the jury and thus barred by Rule 702.

**2.** Other circuits have stated that a district court's admission of expert testimony will be overturned only if manifestly erroneous. *See, e.g., United States v. Boissoneault,* 926 F.2d 230, 232 (2d Cir.1991); *United States v. Espinosa,* 827 F.2d 604, 611 (9th Cir.1987), *cert. denied,* 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988). We understand these circuits to be applying the same test that we apply here.

*Dunn,* 846 F.2d 761, 763 (D.C.Cir.1988); *United States v. Carson,* 702 F.2d 351, 369 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983).

Nevertheless, Boney contends that, although expert testimony on the operations of drug dealers in general may be admissible, Rule 702 prohibits an expert from giving an opinion that a particular defendant played a particular role in alleged criminal activity. His position is that such testimony is barred both because the helpfulness requirement of the rule implicitly prohibits testimony on matters that jurors are expected to infer on their own, and because the testimony comes too close to a direct opinion on guilt or innocence, which would also be proscribed. *See, e.g., United States v. Lockett,* 919 F.2d 585, 590 (9th Cir.1990). Boney notes that the Second Circuit has expressed "discomfort" with testimony that connects particular defendants to roles in criminal conduct, *see Boissoneault,* 926 F.2d at 233, and has stated that "an expert should not be permitted to testify that the defendant's actions fit a pattern of conduct which the expert had observed in prior narcotics investigations." *United States v. Cruz,* 797 F.2d 90, 96 (2d Cir.1986).

Officer Stroud did express an opinion about the actions of the defendants in this case—the government's thinly disguised hypothetical did not render his statements a mere abstract assessment of an imaginary scenario. Nonetheless, Rule 702 does not bar an expert from drawing conclusions in a specific case, including a conclusion that the defendant was involved in illegal activity or playing a specific role in illegal activity. The Rule does not confine an expert to general statements in the field of his expertise; it does not require that any inferences from the facts in the specific case be left to the jury. Although it may be well that an expert should not draw

inferences a jury could make for itself, *see, e.g., Boissoneault,* 926 F.2d at 233, by stating that the defendants' actions fit the pattern of a typical drug sale, Officer Stroud did not draw a conclusion so obvious that it could be thought he invaded the juror's province. *Cf. United States v. Arenal,* 768 F.2d 263, 270 (8th Cir.1985) (holding that the jury would have been competent on its own to conclude that several samples of cocaine all cut with only one agent were from the same source). His testimony was similar to a statement that a defendant's actions mirrored a common criminal *modus operandi*—a form of testimony generally allowed. *See United States v. Espinosa,* 827 F.2d 604, 612 (9th Cir.1987), *cert. denied,* 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988); *United States v. Stewart,* 770 F.2d 825, 831 (9th Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 888, 88 L.Ed.2d 922 (1986); *United States v. Maher,* 645 F.2d 780, 783–84 (9th Cir.1981) (per curiam).

The Second Circuit, however, has objected to such testimony on the slightly different ground that it would be "rather offensive" to allow an expert to approach the ultimate conclusion in the case by testifying that a particular defendant's actions fit a known pattern of criminal conduct. *See United States v. Brown,* 776 F.2d 397, 401 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986).[3] Still, it is part of the normal role of the expert not merely to describe patterns of conduct in the abstract, but to connect actions in a specific case to those patterns— sometimes even to the point of testifying that the defendant was involved in criminal conduct. *See, e.g., United States v. Carson,* 702 F.2d 351 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983). The Second Circuit's marked ambivalence toward such testimony[4] perhaps reflects a concern that as ex-

---

**3.** The *Brown* court nevertheless held that expert testimony concluding that the defendant had played the role of a "steerer" in a narcotics operation was admissible. *See Brown,* 776 F.2d at 401–02.

**4.** Although Boney claims that in *Cruz* the Second Circuit barred testimony connecting a specific defendant to a common criminal *modus operandi,* the law in that circuit is not as clear as he suggests. The Second Circuit has stated recently that an "expert may generally suggest inferences that should be drawn from the facts,

perts depart from general testimony and draw conclusions about criminal conduct in the cases before them, they approach what is generally accepted to be forbidden ground because their opinions verge on conclusions concerning the defendant's guilt.

■ We say generally accepted but note that that proposition is by no means obvious from examination of the Federal Rules of Evidence. At one time an expert was prohibited from testifying on any ultimate issue to be determined by the trier of fact. *See, e.g., United States v. Spaulding,* 293 U.S. 498, 506, 55 S.Ct. 273, 276, 79 L.Ed. 617 (1935). Rule 704(a) specifically removed that prohibition and now expressly permits expert testimony on "ultimate issue[s] to be decided by the trier of fact." FED.R.EVID. 704(a). On the other hand, the commentary to Rule 704 states that, despite the change, Rule 702 (and Rule 403) may still be used to exclude "opinions which would merely tell the jury what result to reach." FED.R.EVID. 704, Note of Advisory Committee on 1972 Proposed Rules. The Fifth Circuit has accordingly regarded the question of guilt or innocence as entailing a legal conclusion rather than an issue for the trier of fact, *see United States v. Masson,* 582 F.2d 961, 964 n. 5 (5th Cir.1978); *see also Owen v. Kerr–McGee Corp.,* 698 F.2d 236, 240 (5th Cir. 1983), and the Ninth Circuit has consistently held that an expert may not give a direct opinion on the defendant's guilt or innocence, although the court has never been specific in its reasoning. *United States v. Lockett,* 919 F.2d 585, 590 (9th Cir.1990); *United States v. Kinsey,* 843 F.2d 383, 388 (9th Cir.), *cert. denied,* 488 U.S. 836, 109

S.Ct. 99, 102 L.Ed.2d 75 (1988); *United States v. Fleishman,* 684 F.2d 1329, 1335–36 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). That position would seem supported by Rule 704(b), which bars an expert from testifying that the defendant had "the mental state or condition constituting an element of the crime charged," FED.R.EVID. 704(b). An opinion that the defendant is guilty necessarily incorporates a conclusion that the defendant had the requisite mental state to meet all elements of the offense. Although the overlapping nature of the provisions treating expert testimony can understandably produce some confusion[5] regarding the precise rule to be relied on to exclude an opinion as to guilt, we agree that a direct opinion on guilt or innocence would be barred and that Rule 702 is a plausible vehicle for challenging such testimony.

Appellant's contentions, however, would require us to go further. Appellant essentially argues that if we accept the general view—that an expert witness must not testify directly as to a defendant's guilt or innocence—we are led inexorably to the Second Circuit's episodic objection to testimony that is the functional equivalent of the forbidden. We disagree. We accept the Fifth and Ninth Circuits' view that an expert may not testify on the ultimate question of guilt or innocence, but find no warrant in the Federal Rules to extend that prohibition. We think that no coherent line can be drawn beyond that restriction and that the effort to find such a boundary has caused the tension we perceive in the Second Circuit's opinions.

including inferences embracing the ultimate issue in the case," *Boissoneault,* 926 F.2d at 232 (citation omitted), and has noted that it has "permitted experts to make conclusory statements, based on their experience, that the defendant was involved in illegal drug-related activity." *Id.* at 233 (citing *United States v. Brown,* 776 F.2d 397 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *United States v. Young,* 745 F.2d 733 (2d Cir. 1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); and *United States v. Carson,* 702 F.2d 351 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335

(1983)). In fact, the language appellant cites from *Cruz* mischaracterizes the holding in *Brown,* a case in which the Second Circuit refused to find error in the admission of an expert's opinion that a defendant had been playing the role of a "steerer" in a narcotics sale. *See Brown,* 776 F.2d at 401–02.

5. That confusion was apparent in this case, for while appellant relied solely on Rules 702 and 403 in pressing his appeal, the government responded as if appellant's argument had been based on Rule 704(b).

Officer Stroud's testimony, which at most matched particular defendants and their actions with paradigm roles in an illegal enterprise, does not amount to a direct opinion on the defendants' guilt. *See Fleishman*, 684 F.2d at 1335–36; *United States v. Masson*, 582 F.2d 961, 964 & n. 5 (5th Cir.1978). Concluding that a defendant's actions (as described by the prosecutor) suggest that the defendant played a given role in a criminal enterprise is not the same as telling the jury that the government has proved every element of its case and that the defendant is guilty as charged.

Indeed, in *United States v. Dunn*, 846 F.2d 761 (D.C.Cir.1988), we permitted testimony similar to Officer Stroud's. There an expert concluded that the nature of activities in a townhouse suggested "a retail operation used for the everyday distribution, distributing of primarily crack and heroin." *Id.* at 762. Officer Stroud similarly opined that the actions described in this case suggested a "runner and holder" type of drug sale and that appellants' actions fit certain roles in the "runner and holder" operation. In *Dunn*, we did not read Rule 702 to bar the expert's conclusion that the facts described an illegal drug operation. The addition in this case of somewhat more specific treatment of individual roles does not warrant a different result under the Rule, and, therefore, we reject appellant's claim.

■ Nevertheless, we echo here the cautionary note we sounded in *United States v. Anderson:* "[T]here is often an inherent danger with expert testimony unduly biasing the jury 'because of its aura of special reliability and trust.'" 851 F.2d 384, 393 (D.C.Cir.1988) (quoting *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir.1973)), *cert. denied*, 488 U.S. 1012, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989). We note that in cases such as this, it is within the trial court's discretion to exclude under FED.R.EVID. 403 expert testimony that goes beyond a description of criminal *modus operandi* in general and assigns specific roles to individual defendants if the court deems it unfairly prejudicial.

In this case, however, Boney did not ask the trial judge to exercise discretion under Rule 403. Although Boney argues on appeal that Stroud's testimony was inadmissible under Rule 403, his objections at trial were not specific enough to raise that issue. Our recognition of the threat expert testimony may pose for "unduly biasing the jury," *Anderson*, 851 F.2d at 393, does not mean that every objection to expert testimony automatically includes an objection that the testimony is unduly prejudicial under Rule 403. Precisely because Rule 403 requires the trial court to undertake a subtle balancing to determine whether the probative value of the evidence outweighs its prejudicial effect, the trial judge must be alerted to the need to balance by a timely and specific objection.

\*　　\*　　\*　　\*　　\*　　\*

■ Even though appellant did not preserve an objection under Rule 403 at trial, we still must review admission of the expert testimony for plain error, *see* FED. R.EVID. 103(d), which means we cannot reverse "other than in extraordinary circumstances 'affect[ing] substantial rights and result[ing] in a miscarriage of justice.'" *United States v. Johnson*, 802 F.2d 1459, 1465 (D.C.Cir.1986) (quoting *United States v. Johnson*, 722 F.2d 407, 409 (8th Cir. 1983)). It is difficult to imagine a Rule 403 challenge that could meet this exacting standard, for Rule 403 contemplates the thoughtful consideration of the trial court and leaves the admission of evidence to the sound discretion of the trial judge. As the Third Circuit stated in *United States v. Long*, 574 F.2d 761, 767 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978), "If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." In any event, in this case we think the district judge could quite reasonably have thought the value of Stroud's testimony connecting the defendants to identifiable roles in a drug sale outweighed its prejudicial effect. And, in hindsight it seems rather clear that whatever prejudicial impact the testimony may have carried, it did not overly influence the jurors, for despite Stroud's suggestion that

Marks had been the "runner" in this drug operation, the jury acquitted Marks on both counts.

### III.

 Appellant Holloman argues that the district court erred in refusing to instruct the jury on the issue of identification. He claims that when identification is a prominent issue, our decisions in *Salley v. United States*, 353 F.2d 897 (D.C.Cir. 1965), and *Macklin v. United States*, 409 F.2d 174 (D.C.Cir.1969), oblige a district court to give an identification instruction when one is requested.[6]

In *Salley* we held that it was reversible error for the district court to refuse the defendant's request for an instruction on mistaken identification. *See Salley*, 353 F.2d at 898–99. But in *Jones v. United States*, 361 F.2d 537 (D.C.Cir.1966), we "emphasized the narrow limitations of our ruling in *Salley*," *id.* at 542, and restricted the holding to fact patterns that revealed some special difficulty in the identification. *Salley* presented just such complications because there "an undercover narcotics agent attempt[ed] to isolate in his recollection the identity of one participant in as many as a 100[sic] similar transactions." *Jones*, 361 F.2d at 542.

 Our holding in *Macklin* was similarly limited. Although we said that in cases in which identification is a major issue the court should instruct the jury on identification *sua sponte*, *see Macklin*, 409 F.2d at 178, our suggestion must be read as precatory. We have not subsequently reversed a district court for failing to offer such an instruction unless particular difficulties complicated the identification testimony in the case. Thus, in *United States v. Telfaire*, 469 F.2d 552 (D.C.Cir.1972), we

analyzed the "prejudice inherent in the failure of the trial court to offer" an identification instruction, *id.* at 555–56, but declined to reverse because the "case exhibit[ed] none of the special difficulties often presented by identification testimony that would require additional information be given to the jury in order for us to repose confidence in their ability to evaluate the reliability of the identification," *id.* at 556. The Fourth Circuit thus summarized our cases accurately when it stated that the instruction is "compelled" only when there are "special difficulties," *United States v. Brooks*, 928 F.2d 1403, 1406 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 140, 116 L.Ed.2d 106 (1991)—in the absence of such circumstances the failure to instruct is not error.

 Officer Young's identification of Holloman in this case presented no special difficulties. Young executed a single transaction face to face with Holloman in an area lit by streetlights. Within minutes he radioed a description of Holloman to his team, and shortly thereafter he identified Holloman at the scene of the arrest.

### IV.

Boney and Holloman also argue that the district court erred in refusing to grant their motion for a new trial in light of the discovery, after conviction but before sentencing, that one of the jurors in their trial was a felon. The appellants contend that in this situation the Sixth Amendment guarantee of an impartial jury requires a new trial. They urge us to interpret the Sixth Amendment in light of 28 U.S.C. §§ 1865–1867 which govern the jury selection process.

---

**6.** The government argues that appellant Holloman did not properly object to the jury instruction at trial. In fact, Holloman's counsel effectively objected to the instruction twice. Before the charge was given, Holloman's counsel stated that she would make objections on behalf of all three defendants and that counsel for Marks and Boney would "chime in." Counsel for Boney then objected to the decision not to give an identification instruction. The earlier statement by Holloman's counsel was sufficient,

however, to alert the court that all three defendants were joining each other's objections. Furthermore, after the charge had been given, but before the jury retired, the trial court allowed another opportunity for objections. Counsel for Holloman then clearly objected to the lack of an identification instruction. Because FED. R.CRIM.P. 30 requires only that an objection to the charge be raised before the jury retires to consider its verdict, Holloman's objection was sufficient.

■ The appellants eschew direct reli-ance on 28 U.S.C. §§ 1865–1867 because the statutory remedy would appear time-barred. We think the statute is inapplicable to the appellants, but not just because their objection to a juror who concealed his felon status was untimely. Rather, 28 U.S.C. §§ 1865–1867 do not help appellants because those provisions address a different problem—the procedures by which the district court should administer the jury selection process. Section 1865 requires a district court official to exclude certain groups of jurors, including both convicted felons and individuals accused of a felony, pursuant to status-based disqualifications. 28 U.S.C. § 1865(b)(5). But § 1867 establishes strict procedural limitations on the ability of parties to raise objections to the jury selection process. Subsection 1867(a) allows the defendant to object "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." 28 U.S.C. § 1867(a). And subsection 1867(e) emphasizes that the § 1867 procedures constitute the "exclusive means" by which parties can challenge the jury for improper selection. 28 U.S.C. § 1867(e). These provisions do not apply directly to our case, however, because when a juror fails to disclose his felon status on the jury qualification form, no defect in the court's jury selection process occurs.

■ Insofar as 28 U.S.C. §§ 1865–1867 are relevant to our analysis, moreover, they counsel against any rule that would lead to automatic reversal. The statutory scheme permits a conviction to stand in the face of an untimely allegation that the district court allowed a felon juror to serve in violation of the proper jury selection process. For example, if a juror acknowledged his felon status on the jury qualification form but was permitted to serve in violation of § 1865, § 1867 would bar an untimely challenge to his service. *See, e.g.,*

*United States v. Uribe,* 890 F.2d 554, 561 (1st Cir.1989) ("Like so many statutory rights, the right to exclude felons must be affirmatively invoked."). To be sure, § 1865 evinces a congressional purpose to restrict the service of felons on juries. The strict procedural limitations of § 1867, however, make abundantly clear that other values, such as judicial efficiency and finality, tempered Congress' desire to bar felon-jurors and led Congress to reject a rule of *per se* reversal.

■ The Sixth Amendment right to an impartial jury similarly does not require an *absolute bar* on felon-jurors. The Supreme Court has stressed repeatedly that the touchstone of the guarantee of an impartial jury is a protection against juror bias. *See, e.g., McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 849, 78 L.Ed.2d 663 (1984).[7] A *per se* rule would be appropriate, therefore, only if one could reasonably conclude that felons are always biased against one party or another. But felon status, alone, does not necessarily imply bias. In fact, as the dissent suggests, Congress' purpose in restricting felons' jury service may stem from considerations other than a concern for biased jurors. Dissent at 637–38. More important, a *per se* rule requiring a new trial whenever it turns out that a felon served on a jury seems inconsistent with *McDonough*'s hostility to unnecessary new trials, *id.* at 553–54, 104 S.Ct. at 848–49, and the oft-repeated axiom that "[a defendant] is entitled to a fair trial but not a perfect one." *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953). We think, therefore, that the Sixth Amendment guarantee of an impartial trial does not mandate a *per se* invalidation of every conviction reached by a jury that included a felon. *Accord United States v. Uribe,* 890 F.2d 554, 562 (1st Cir.1989); *United States v. Currie,* 609 F.2d 1193, 1194 (6th Cir.1979) (per curiam), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314,

**7.** Although *McDonough* involved a juror's failure to disclose information during the *voir dire* examination in a civil case, we have applied *McDonough* to criminal trials. *See United*

*States v. North,* 910 F.2d 843, 904 (D.C.Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

63 L.Ed.2d 760 (1980); *Ford v. United States*, 201 F.2d 300, 301 (5th Cir.1953); *cf. Raub v. Carpenter*, 187 U.S. 159, 163, 23 S.Ct. 72, 73, 47 L.Ed. 119 (1902) (denying a motion for a new trial in a civil case).[8]

Even though the Sixth Amendment does not require automatic reversal, there is still the question whether appellants were entitled to a hearing to determine whether the juror was in fact biased. Although the discovery of the juror's felon status does not by itself require a new trial, we think the juror's failure to disclose his status in response to the *voir dire* examination presents serious added concerns. After all, lying or failing to disclose relevant information during *voir dire* itself raises substantial questions about the juror's possible bias. While refusing to adopt a *per se* rule requiring a new trial in *United States v. North*, 910 F.2d 843 (D.C.Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991), we recognized the seriousness of a juror's deliberate concealment of relevant information during *voir dire*. We assumed that a district court should grant a new trial upon a showing of actual bias and affirmed the district court's denial of a motion for a new trial because it had held an evidentiary hearing and found no bias. *Id.* at 904–05; *see also United States v. Currie*, 609 F.2d 1193, 1194 (6th Cir. 1979) (per curiam) (affirming the district court's denial of a motion for a new trial after an evidentiary hearing determined that those jurors who had lied about their felon status were not biased against the defendant), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980).

 In this case, however, the district court judge denied the defendant's motion for an evidentiary hearing. To be sure, our reliance in *North* on the district judge's evidentiary hearing did not settle the question whether a hearing is *required* when it is revealed after trial that a juror had concealed relevant information. The Supreme Court, likewise, has not directly faced this issue, but it has noted the general principle "that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940, 945, 71 L.Ed.2d 78 (1982). We think the district judge was obliged to conduct such a hearing here. *Cf. Hard v. Burlington N.R.R.*, 812 F.2d 482, 484 (9th Cir.1987) (ruling that, under the facts of that case, the district court's failure to grant an evidentiary hearing about juror dishonesty was an abuse of discretion). We do not now hold that any false statement or deliberate concealment by a juror necessitates an evidentiary hearing. But we believe that a juror's refusal to admit his felony status is particularly troublesome. Unlike some information sought in *voir dire*, a question about felon status would strike the average juror as extremely serious and sensitive. Lying about a factor as important (and as easy to verify through public records) as felon status raises at least the inference that the juror had an undue desire to participate in a specific case, perhaps because of partiality.[9] Because the record provides no evidence that the motivation for the lie was unrelated to bias in this case, it was an abuse of discretion under these facts for

---

**8.** The dissent finds support for a *per se* rule in the power of a trial judge to strike jurors for cause and grant a new trial in the interests of justice. Dissent at 639; 643. That the trial judge possesses this power does not suggest that it was error for him to decline to exercise it. Our review of that decision is governed by the abuse of discretion standard. The dissent, however, would use the existence of the trial judge's discretion to fashion a rule promulgated by the court of appeals—a rule which permits a defendant to challenge his conviction, because a felon sat on his jury, at least at any time before judgment is entered and presumably later

through a post-judgment motion for a new trial or on direct appeal and perhaps years later under § 2255. *See* 28 U.S.C. § 2255. That appears to be straightforward federal policymaking, which we think is reserved to Congress.

**9.** All other things equal, the likelihood that a juror who conceals information is biased increases with the likelihood that disclosure of the information will lead to his disqualification. Because the disclosure of a felon status during trial leads to almost certain disqualification, concern about concealing that status is particularly appropriate.

the trial judge not to have held an evidentiary hearing.

We therefore remand this case for the district court to hold an evidentiary hearing to determine whether the juror's failure to disclose his felon status resulted in actual bias to the appellants.

## V.

Appellant Holloman also claims that his sentence was improper. Although Holloman was convicted only of distribution of .199 grams of cocaine and acquitted of possession with intent to distribute the 12.72 grams that Boney had under the pickup truck, the presentence report aggregated the two amounts of cocaine and calculated an offense level based on the combined weight of 12.919 grams. The offense level determined a sentencing range of 63 to 78 months, well within the statutory maximum of 20 years set by 21 U.S.C. § 841(b)(1)(C), but far above the range of 10 to 16 months that would have applied had only the .199 grams been used to calculate the offense level.

The district court, finding by at least a preponderance of the evidence that Holloman also possessed the 12.72 grams of cocaine discovered under the pickup truck,[10] considered that "relevant conduct" under § 1B1.3(a) of the Guidelines and sentenced Holloman to 63 months. Had Holloman been convicted on the possession with intent to distribute count, the same sentencing range of 63 to 78 months would have applied. Holloman argues that the Sentencing Guidelines do not permit consideration of the drugs involved in the count on which he was acquitted. And he contends that by considering those drugs in sentencing and by giving him the same sentence that he could have received had he been convicted on both counts, the district court violated the Double Jeopardy and Due Process Clauses of the Fifth Amendment.

The appellants' argument is offered in the face of overwhelming prior judicial rejection; a full ten circuits have authorized the use of acquitted conduct in sentencing under the Sentencing Guidelines. *See United States v. Coleman,* 947 F.2d 1424, 1428–29 (10th Cir.1991); *United States v. Rivera–Lopez,* 928 F.2d 372, 372–73 (11th Cir.1991) (per curiam); *United States v. Fonner,* 920 F.2d 1330, 1332–33 (7th Cir. 1990); *United States v. Duncan,* 918 F.2d 647, 652 (6th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991); *United States v. Rodriguez–Gonzalez,* 899 F.2d 177, 180–81 (2d Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); *United States v. Dawn,* 897 F.2d 1444, 1449–50 (8th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 389, 112 L.Ed.2d 400 (1990); *United States v. Mocciola,* 891 F.2d 13, 16–17 (1st Cir.1989); *United States v. Isom,* 886 F.2d 736, 738–39 (4th Cir.1989); *United States v. Juarez–Ortega,* 866 F.2d 747, 748–49 (5th Cir.1989); *United States v. Ryan,* 866 F.2d 604, 608–09 (3d Cir.1989). Only the Ninth Circuit, over a strong dissent by Chief Judge Wallace, has rejected the use of acquitted conduct in sentencing, and it did not rest its decision on constitutional grounds. *See United States v. Brady,* 928 F.2d 844, 851–52 & n. 14 (9th Cir.1991).

The "relevant conduct" upon which the Guidelines require that an offense level be based is, for drug related offenses, sweepingly defined to include "all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). That language is certainly broad enough to include acts underlying offenses of which the defendant has been acquitted. Indeed, the application notes make clear that conduct may be relevant for sentencing even if the defendant was not convicted on *any* count involving that conduct. *See id.* § 1B1.3, Commentary Application Note 2. Section 6A1.3(a) of the Guidelines allows a broad range of information to be used in sentencing and requires simply that the information have "sufficient indicia of reliability to support

---

10. In fact, the sentencing court suggested that Holloman's possession of the 12.72 grams of cocaine had been shown beyond a reasonable doubt.

its probable accuracy." U.S.S.G. § 6A1.3(a). Congress also has endorsed an expansive view of the information that may be used in sentencing: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court ... may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. We will, therefore, leave the Ninth Circuit in isolation on this issue and join, instead, the other ten circuits in holding that Sentencing Guidelines allow the use in sentencing of conduct underlying acquitted counts.[11]

 Holloman's constitutional challenges are not significant. Holloman argues that use of the acquitted conduct to enhance his sentence violated the Double Jeopardy Clause by punishing him for an offense of which he was acquitted. Even assuming that the Double Jeopardy Clause, rather than the Due Process Clause, would protect a defendant from being sentenced for a charge of which he was acquitted, Holloman's argument "misperceives the distinction between a sentence and a sentence enhancement." *Mocciola*, 891 F.2d at 17. The district court did not impose a separate sentence on Holloman for the possession count. Rather, it considered the drugs involved in that count to enhance his sentence within the statutory range for the distribution offense of which he was convicted: "the acquitted conduct merely affected the point within the statutory range at which his sentence was imposed." *Rodriguez–Gonzalez*, 899 F.2d at 181. In the absence of a separate punishment for the acquitted conduct, Holloman does not have an arguable claim based on the Double Jeopardy Clause.

 Holloman's due process argument is based on the false assumption that his acquittal is equivalent to a finding of complete innocence. But a not guilty verdict simply indicates that guilt was not proved beyond a reasonable doubt; it does not establish that the defendant played no part in the charged conduct. *See, e.g., Fonner*, 920 F.2d at 1332; *Isom*, 886 F.2d at 738; *cf. United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361–62, 104 S.Ct. 1099, 1104, 79 L.Ed.2d 361 (1984). Conduct underlying the acquittal may be used in sentencing as long as it is proved by a standard that satisfies due process. Although Holloman's assertions imply that the Constitution requires proof beyond a reasonable doubt in sentencing, it is well established that "due process is satisfied so long as facts necessary for sentencing are proved by a preponderance of the evidence." *United States v. Burke*, 888 F.2d 862, 869 (D.C.Cir.1989); *see also McMillan v. Pennsylvania*, 477 U.S. 79, 91–92, 106 S.Ct. 2411, 2418–19, 91 L.Ed.2d 67 (1986) (approving the same standard in the context of state sentencing). Because the sentencing court found by at least a preponderance of the evidence that Holloman possessed the 12.72 grams of cocaine, it committed no constitutional error in considering that cocaine to enhance his sentence.

 Admittedly, Holloman received the same sentence he would have had if he had been convicted on the possession count. That result is rather anomalous and is certainly unlucky from Holloman's perspective, but it is not unconstitutional. Neither due process nor the Double Jeopardy Clause requires that a defendant convicted on multiple counts under the same statute receive a different sentence from a defendant convicted on only one count. The result in Holloman's case is merely a consequence of Congress' decision to make both distribution and possession with intent to distribute the same substantive offense under 21 U.S.C. § 841(a) and to base sentencing on the weight of drugs involved.

\* \* \* \* \* \*

11. Relying on the above provisions we have already approved the use in sentencing of the weight of drugs involved in uncharged criminal conduct and dismissed counts. *See United States v. Chaikin*, 960 F.2d 171, 174 (D.C.Cir. 1992); *United States v. Salmon*, 948 F.2d 776, 778 (D.C.Cir.1991). Similarly, we have allowed the use in sentencing of evidence seized in violation of the Fourth Amendment. *See United States v. McCrory*, 930 F.2d 63, 67–69 (D.C.Cir. 1991), *cert. denied*, — U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992). Conduct underlying an acquittal does not require different treatment under the Guidelines.

Accordingly, we reject all of the challenges the appellants raise against their convictions except their argument that the Sixth Amendment requires an evidentiary hearing to determine whether a juror's failure to disclose his felon status resulted in actual bias against the appellants. We remand to the district court to hold such a hearing.

*It is so ordered.*

RANDOLPH, Circuit Judge, dissenting in part and concurring in part:

I do not agree with my colleagues' assessment of what consequences flow from the discovery, after a jury trial, that the foreman of the jury happened to be a recently-convicted felon. Assuming that the juror's civil rights have not been restored, I would reverse the convictions and require a new trial. In my view, the status of the juror as a felon plus the juror's deception of court and counsel during *voir dire* demonstrates that this individual could not be trusted to conform to the court's instructions and to discharge faithfully his duties as a juror.

I also write separately with respect to the question whether the Double Jeopardy Clause forbids a district court from calculating a defendant's sentence for committing one drug offense in light of the quantity of drugs involved in a charge of which the defendant was acquitted. Although I agree with the result my colleagues reach, the case is close and I believe the effect of

our ruling on the nullification power of the jury ought to be brought out in the open.

## A. THE FELON-JUROR

My colleagues apparently view the felon-juror's deceptive silence on *voir dire* as the source of the problem. They treat this case as if it is governed by *United States v. North*, 910 F.2d 843, 904 (D.C.Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991), which held that when a juror has made a false statement on *voir dire*, "an aggrieved party must show that the juror's correct response ... would have demonstrated actual bias." *North* interpreted *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). In both cases, jurors had incorrectly answered a question on *voir dire*, in *North* deliberately, in *McDonough* inadvertently. A correct answer in each case would have revealed the possibility of actual bias, of the juror's favoring or disfavoring one·side for reasons other than the weight of the evidence.[1] But "bias" is not the problem here.

Felons are disqualified from serving on juries in both criminal and civil cases. 28 U.S.C. § 1865(b)(5). It is not their "bias" that disables them. The Jury Selection and Service Act of 1968 (the Act), 28 U.S.C. §§ 1861–1878, excluded felons to preserve the "probity" of the jury. H.R.REP. No. 1076, 90th Cong., 2d Sess. 6 (1968).[2] It

---

**1.** *McDonough* was a civil action for damages arising from an allegedly defective product. Counsel had asked the prospective jurors whether they or any member of their family had ever been "seriously injured" by a defective product. One juror had remained silent even though his son's leg had been broken when a tire exploded. It later turned out he did not consider the broken leg a "serious" injury. In *North*, a criminal case, one juror did not speak up when the court asked the jury panel if they or any members of their families had ever been convicted of a crime, though one of this juror's brothers had been convicted.

**2.** Section 1865 provides in pertinent part that:
(a) The chief judge of the district court, or such other district court judge as the plan may provide, on his initiative or upon recommendation of the clerk or jury commission, shall determine solely on the basis of information provid-

ed on the juror qualification form and other competent evidence whether a person is unqualified for ... jury service.

....

(b) In making such determination the chief judge of the district court, or such other district court judge as the plan may provide, shall deem any person qualified to serve on grand or petit juries in the district court unless he—
(1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;
(2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
(3) is unable to speak the English language;
(4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or

broke no new ground in doing so. The ancient Greeks barred criminals termed "infamous" from serving on juries. Special Project, *supra* note 2, 23 VAND.L.REV. at 941 n. 1. Blackstone cites COKE'S INSTITUTES for the proposition that a felon may not serve on a jury. 3 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 361–63; *see also* 4 W. BLACKSTONE, *supra*, at 352. At common law, felons were barred from American juries, and most states now have statutes to this effect, though many (like section 1865) provide that a felon may serve if he has been rehabilitated formally into society. Special Project, *supra*, 23 VAND.L.REV. at 1054. Though the exact reasons for this ancient disability are not crystal clear, none of the proposed explanations involve "bias." *Id.* at 941–50, 1051. Rather, they have ranged from the idea that a criminal has "declared war upon the community," *id.* at 942, and so should be cast out of it as punishment, to the dubious notion that adding this particular bar to the broad array of other post-incarceration sanctions would increase deterrence of crime, *id.* at 944–45. Felons' exclusion from juries may also have developed from an earlier exclusion of felons as witnesses, *id.* at 1051, a practice that continues in milder form to this day. *See* FED.R.EVID. 609. As Aristotle saw it, to serve on a jury was to hold public office; the capacity to do so was constitutive of being a citizen. POLITICS, BK. III 1275a.

Where all this should lead today is not altogether certain. The defendants think the congressional determination of unfitness conclusively establishes that the presence of a disqualified felon denies them the "impartial jury" guaranteed by the Sixth Amendment. The government objects that section 1865 has no bearing here because Boney and Holloman failed to comply with the time limits set forth in section 1867(a). This requires a criminal defendant to raise alleged violations of the Act "before the *voir dire* examination begins, or within seven days after [he] discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier...." 28 U.S.C. § 1867(a).[3] Neither side has it exactly right.

The extent to which the "jury" requirement of the Sixth Amendment (and Article III) immutably incorporates the common-law bar to service by a felon is unclear. *United States v. Wood,* 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed. 78 (1936), stands for the

---

(5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

The exclusions have been thus enumerated since 1948. Act of June 25, 1948, ch. 646, 62 Stat. 869, 952. Prior to that time, the qualifications for a juror in federal court were those for a juror in the highest court of the state in which the federal court sat. *See* H.R.REP. No. 1652, 95th Cong., 2d Sess. 5 & n. 4 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5477, 5478 n. 4; *see also* § 29 of the Judiciary Act of 1789, ch. 20, 1 Stat. 73, 88. Though I have not undertaken a survey, it is probable that felons were excluded from jury service in all of those courts. *Cf.* Special Project, *The Collateral Consequences of a Criminal Conviction,* 23 VAND.L.REV. 929, 1051 (1970).

3. The government also claims the defendants waived their argument because, in their motion for a new trial on the basis of the felon-juror, they did not specifically cite § 1865 to the district court. I think the issue was preserved. Though defendants did not cite § 1865, they certainly made clear the basis of their objection.

The proposition that felons should be excluded from juries is not a novel one, and could not have come as a surprise to the district court. The government itself cited § 1865, invoking and relying on cases from other circuits discussing the provision. Government's Opposition to Defendants' Motion for a New Trial at 4–5 & n. 2 (filed Aug. 15, 1990). The district court therefore had the statute before it, and we may properly consider it. *Cf. Duignan v. United States,* 274 U.S. 195, 200, 47 S.Ct. 566, 568, 71 L.Ed. 996 (1927).

An additional consideration impels this course. To hold the statute "waived" would lead directly to defendants' constitutional argument. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Spector Motor Co. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944), *quoted in Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985); *see also Rescue Army v. Los Angeles,* 331 U.S. 549, 570–75, 67 S.Ct. 1409, 1420–23, 91 L.Ed. 1666 (1947); *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

proposition that though the "settled rule[s] of the common law," *id.* at 141, 57 S.Ct. at 183, may have been "embedded in the Sixth Amendment," *id.* at 137, 57 S.Ct. at 183, congressional implementation or modification of those rules should be respected by the courts. *Id.* at 142–43, 57 S.Ct. at 183–84. I would therefore reject the defendants' argument that the Sixth Amendment itself bars felons from serving on juries and requires reversal *per se* where one slips through. What federal law, informed by historical practice and Congress' enactment on the subject may require, is a different question.

As to the government's objection, the time limits of section 1867(a) cannot be read to allow a felon, barred under section 1865(b)(5), to sit on a jury whenever no one objects prior to the start of *voir dire.* Those time limits did not revoke a litigant's time-honored right to challenge a prospective juror for cause. No one would suppose that upon the discovery of a felon on *voir dire* the court could not exclude him because the time for doing so had passed. 2 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 2D § 383 (1982). Another provision of the Act, 28 U.S.C. § 1866(c)(4), expressly confirms the court's power to strike venire members "upon a challenge by any party for good cause shown." The Act imposes no time limits on the exercise of this authority, an authority derived from the inherent power of the federal courts to provide for the conduct of their criminal trials, and a source of protections in excess of those required by the Constitution. *Murphy v. Florida,* 421 U.S. 794, 797–98, 95 S.Ct. 2031, 2034–35, 44 L.Ed.2d 589 (1975); *Marshall v. United States,* 360 U.S. 310, 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959); *see also United States v. Provenzano,* 620 F.2d 985, 995–96 (3d Cir. 1980). The inquiry into how that power ought to be exercised in response to a particular challenge is properly guided by the policies and practices underlying and incorporated in the Sixth Amendment, as well as those underlying the basic juror qualifications adopted by Congress in section 1865. *Cf. United States v. Olano,* 934 F.2d 1425, 1438–39 (9th Cir.1991), *cert.*

*granted,* ⸺ U.S. ⸺, 112 S.Ct. 1935, 118 L.Ed.2d 542 (1992).

There is no reason to suppose that the time limits of section 1867 were meant to work a wholesale (and absurd) limitation of that power. Nothing magical happens at the moment *voir dire* begins. A felon's character is not suddenly altered, a juror completely unfamiliar with the English language does not suddenly become fluent. At any rate, the Jury Selection and Service Act primarily concerns how prospective jurors are selected; its purpose was to ensure that venires reflect a "fair cross section of the community," 28 U.S.C. § 1861, by replacing the old "key man" system of selection with a more neutral methodology. S.REP. No. 891, 90th Cong., 1st Sess. 9–12 (1967). Challenges to the way in which the venire was chosen are unlikely to be aided by any information gained by individually examining prospective jurors. The qualifications set out in section 1865 are a different matter. Whether a juror is unable to speak English, section 1865(b)(3); is under the age of 18, section 1865(b)(1); is physically or mentally infirm, section 1865(b)(4); or is a convicted felon, section 1865(b)(5), are all susceptible to detection upon questioning of the individual. Congress also supposed that trial judges retained the power to exclude section 1865(b)–unqualified jurors by "check[ing] in court whether the qualification determinations made up to that point were valid," and eliminated as "redundant" a section so providing in the bill leading to the Act. S.REP. No. 891, *supra,* at 32 n. 33. Congress thought "that power [was] not limited by any time requirement." *Id.*

The time limits of section 1867(a) thus do not absolutely preclude a challenge, based on the fact that the panel contained an individual disqualified by section 1865(b), just because that challenge was made after the start of *voir dire.* This comports with the longstanding practice of replacing an original juror with an alternate during the trial when the original juror is determined to be unqualified. *See, e.g., United States v. Gottfried,* 165 F.2d 360, 365 (2d Cir.) (L. Hand, J.), *cert. denied,* 333 U.S. 860, 68

S.Ct. 738, 92 L.Ed. 1139 (1948). *See* Fed. R.Crim.P. 24(c). It is also assumed by Rule 23, which allows a court "to excuse a juror for just cause after the jury has retired to consider its verdict," and which provides that "a valid verdict may be returned by the remaining 11 jurors." Fed.R.Crim.P. 23(b). If a disqualified juror is impanelled in spite of the parties' diligent efforts,[4] the trial judge is not thereby deprived of the power to take corrective action when the relevant facts come to light.

I therefore move on to the defendants' argument for vacating their convictions. Supreme Court precedent of old vintage, cited by neither side, seems to point against their position. In *Raub v. Carpenter,* 187 U.S. 159, 23 S.Ct. 72, 47 L.Ed. 119 (1902), a civil case, a juror stated on *voir dire* that he was over twenty-one and had not been convicted of any crime. Both statements proved to be false. The Court determined, however, that the verdict was the only one that "could be rendered consistently with the facts"; the presence of the felon-juror therefore could not have prejudiced the appellants. 187 U.S. at 163, 23 S.Ct. at 73. The Court then addressed the contention that the judgment was a nullity for want of power to enter it. Citing *Kohl v. Lehlback,* 160 U.S. 293, 302, 16 S.Ct. 304, 307, 40 L.Ed. 432 (1895), which held that a verdict was not "void" though rendered by a jury including an alien subject to challenge *propter defectum, Raub* stated that the judgment below was "not ... absolutely void," 187 U.S. at 164, 23 S.Ct. at 74. (*Kohl* had presented—on habeas—the question whether a New Jersey statute was contrary to the New Jersey Constitution. The Court noted either the New Jersey courts had concluded otherwise, or they had not been asked, and de-

clined to hold that application of the state statute, in light of provisions of the state constitution, violated federal due process or equal protection. 160 U.S. at 302–03, 16 S.Ct. at 307.) *Raub* rested on the fact that, since a directed verdict could have been entered, the plaintiff could not possibly have been prejudiced by the juror's presence. The premise does not hold in this case, *see Sparf and Hansen v. United States,* 156 U.S. 51, 105–06, 15 S.Ct. 273, 294–95, 39 L.Ed. 343 (1895), so the conclusion need not control. Two courts have nevertheless read *Raub* and *Kohl* as requiring a showing of actual bias or actual prejudice to the defendant before a new trial may be granted. *United States v. Currie,* 609 F.2d 1193, 1194 (6th Cir.1979); *Ford v. United States,* 201 F.2d 300, 301 (5th Cir.1953).

A middle ground, one suggested by *North,* is to remand for a hearing on the prejudicial effect of the felon-juror's presence. This is my colleagues' solution. The difficulty is that the hearing, if it got off the ground, would go but a short distance. What would be the nature of the inquiry? Whether the felon actually was able to render adequate service as a juror? Apart from the felon himself, who could be called as a witness? Not the other jurors. Rule 606(b), Fed.R.Evid., forbids jurors from testifying about their deliberations. The rule also would foreclose such questioning of the felon-juror. *See Tanner v. United States,* 483 U.S. 107, 120–27, 107 S.Ct. 2739, 2747–51, 97 L.Ed.2d 90 (1987). Perhaps he could be asked whether he honored his oath, followed the judge's instructions and executed faithfully his responsibilities. Suppose he answered in the affirmative. Why should he be believed? He already

---

4. Diligence distinguishes this case from *United States v. Uribe,* 890 F.2d 554 (1st Cir.1989), relied on by the government. There, the felon who eventually made it onto the jury had disclosed his status on a juror qualification form, which, although available to the defendants under a local rule, was not examined by them until after the verdict was in. *Id.* at 561. While the *Uribe* court wrote broadly, to cover situations where the juror's status was "unknowable," the decisional facts did not present that circumstance. Unlike *Uribe,* the juror here act-

ed deceptively, concealing his status on *voir dire;* the government does not suggest anything defendants reasonably should have done to uncover this deception before the verdict. This case differs from *Uribe* in another significant respect. When it comes to capacity for conforming to law, felons are in a suspect class. If a particular felon-juror practices deception on *voir dire* (which the juror in *Uribe* did not), the suspicion concerning felons as a class is confirmed with respect to that particular individual.

lied once about his status, and his position as a felon itself throws doubt on his veracity. That is why the rules allow witnesses to be impeached by their prior convictions. Fed.R.Evid. 609. Perhaps the hearing could focus on why he deceived the court by not disclosing his status as a felon. But if he were represented, as he probably should be in view of 18 U.S.C. §§ 401, 1621, his counsel would likely advise him not to answer at all. *See, e.g., United States v. Vargas,* 606 F.2d 341, 344 (1st Cir.1979). If he did respond, his answers would still suffer from a lack of trustworthiness.

What I have just written should not be taken to pertain to post-verdict inquiries into a juror's actual bias. As I have said, *North* approved such inquiries, and rejected Judge Winter's view for the Second Circuit that a juror's intentional nondisclosure on *voir dire* requires the conviction to be vacated if a truthful answer would have revealed a "view on the merits" that might have led to the juror's being struck either peremptorily or for actual bias. *Compare North,* 910 F.2d at 904–05, *with United States v. Colombo,* 869 F.2d 149, 151 (2d Cir.1989). A felon's exclusion is not for bias, so neither case speaks to the situation here.

"Technically a juror who fails to meet the statutory qualifications is subject to challenge 'for *cause*' while a juror who is biased is subject to challenge 'for *favor*.'" 2 C. WRIGHT, *supra,* at 361 (emphasis added). Though Professor Wright states that the "distinction [is] lost on the present generation of lawyers," *id.,* I would revive it here. A judge confronted with a challenge "for *favor*" must first determine which type of bias challenge he is facing: a challenge for "actual bias," or one for "implied bias." The former is "bias in fact," the latter is "conclusively presumed as a matter of law." *Wood,* 299 U.S. at 133, 57 S.Ct. at 179. If the challenge is for actual bias, the trial judge must then determine whether the juror would in fact be unlikely to render impartial service. This is easy when the juror has admitted bias for or against a party, or has acknowledged some other reason why he would find it difficult to "render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). A closer question arises when a juror professes ability to render fair service but doubts nonetheless remain. *Compare Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), *with Irvin,* 366 U.S. at 728, 81 S.Ct. at 1645. Then the judge must look, so the cases indicate, at the facts giving rise to the inference and determine whether the juror can or "cannot realistically be expected to be impartial." 2 C. WRIGHT, *supra,* at 363. This process can be duplicated in a post-trial hearing: facts that would have come to light following a correct answer on *voir dire* can be developed, inferences from them drawn, and the possible existence and strength of the juror's bias determined. The district court then can make a judgment about whether a challenge for actual bias would have been made, and if so, granted. *See, e.g., United States v. North,* 716 F.Supp. 652, 655–56 (D.D.C.1989); *cf.* W. LaFAVE & J. ISRAEL, CRIMINAL PROCEDURE § 24.6, at 1046 (2d ed. 1992). The facts of *North,* like the facts of *McDonough,* presented a question of "actual bias," not the more "exceptional circumstance[ ]" in which "the facts are such that bias is to be inferred." *North,* 910 F.2d at 904, *quoting McDonough,* 464 U.S. at 556–57, 104 S.Ct. at 850 (Blackmun, J., joined by Stevens & O'Connor, JJ., concurring). *North*'s requirement of a "showing of actual bias," 910 F.2d at 905, would of course necessarily already be met when the facts constituted grounds for a challenge for implied bias.

When concealment has frustrated a challenge "for *cause*," however, a post-trial inquiry into actual bias lacks purpose, and in no way replicates what ideally would have happened before trial. In this respect it is similar to a challenge for implied bias, which leads to the *per se* exclusion of the veniremember. If a felon correctly completes the juror qualification form, he is not even summoned for jury duty. *See* Modified Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors (As Amended Through August 15,

1991), §§ E & F, at 4. If he slips through at that stage but is discovered before trial, presumably he is excluded without further ado, 2 C. WRIGHT, *supra*, § 383, not because of an inference, arising out of the identities of the parties and other circumstances of a particular case, that he will be biased for one side or against the other, but rather because Congress determined that he ought not sit on *any* jury, determine the fate of *any* party, under *any* circumstances, in *any* case. That judgment reflects concern about maintaining the integrity of the jury, *cf.* section 1866(c)(5); H.R.REP. No. 1076, *supra*, at 6, and with it, public confidence in verdicts. As Justice Kennedy recently put it, "[t]he purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law *by persons who are fair.*" *Powers v. Ohio,* — U.S. —, —, 111 S.Ct. 1364, 1372, 113 L.Ed.2d 411 (1991) (emphasis added). Congress, I believe, adopted what is no doubt the traditional view—reflected elsewhere in our law, *see, e.g.,* FED.R.EVID. 609(a), (c)—that felons are generally less trustworthy and responsible than others, and that they just cannot be counted on to be "fair."

This bar is not absolute. It applies only to felons whose "civil rights have not been restored," 28 U.S.C. § 1865(b)(5) (a determination made by each state), and thereby preserves some state influence on who may sit on federal juries. The District of Columbia does not appear to have a formal procedure for the restoration of a felon's civil rights, *see Williams v. United States,* 421 A.2d 19 (D.C.App.1980). A felon may serve upon a jury in the District of Columbia courts when one year has passed since the completion of his "incarceration, probation, or parole," and when he has been certified pursuant to the District's jury system plan. D.C.CODE ANN. § 11–1906(b)(2)(B). That a felon could be incompetent to serve on a jury one month but competent the next, or could be incompetent in a federal court in one state but competent in another, makes the ban seem somewhat arbitrary. But that is the neces-sary consequence of two determinations Congress made, and under *Wood* is allowed to make, 299 U.S. at 141, 57 S.Ct. at 183, in writing the statute: that a felon is, at some point, sufficiently rehabilitated to have his civil rights restored, and that the fixing of that point should be left to the states. *But cf.* Fed.R.Evid. 609(c) & advisory committee's note thereto. It is not a justification for us, once the rule has been broken, to throw up our hands and walk away.

Nor can it be said that a felon inevitably must be biased for the defendant and against the prosecution, so that in criminal cases, involving guilty verdicts, no difficulty is presented. First, I am disinclined to interpret a statute based on suppositions about felon psychology. Second, were I to indulge in such hypothesizing, I might see at least two reasons why a felon could be prejudiced towards a guilty verdict. He may have developed a callous cynicism about protestations of innocence, having no doubt heard many such laments while incarcerated. Or his desire to show others— and himself—that he is now a good citizen might lead him to display an excess of rectitude, both in his deliberations and in his vote. Given the constraints on what evidence can be developed at a post-trial hearing, *see supra* p. 640, a defendant is unlikely ever to be able to show how the felon-juror reached his conclusions, or how he may have influenced the other jurors. And unlike cases involving bias, there are no facts extrinsic to the jury's deliberations (other than the felon's status under section 1865(b)(5)) that are likely to reveal whether the reasons underlying the exclusion were implicated in a particular case.

That a felon has been unwilling to conform his conduct raises doubts about his capacity to honor the juror's oath, and to comply with the trial judge's instructions. These concerns intensify when, as occurred here, the felon deceives court and counsel about his status on *voir dire.* Such a person simply cannot be trusted to perform faithfully the solemn duty of sitting in judgment of others.

The reasons underlying the exclusion of felons from juries and the limitations on what evidence may be received mean that "[e]fforts to prove or disprove ... preju-

dice from the record before us would be futile, and guesses whether the outcome of the trial might have been different ... purely speculative." *Riggins v. Nevada,* — U.S. —, —, 112 S.Ct. 1810, 1816, 118 L.Ed.2d 479 (1992). I would therefore decline to join *Ford,* 201 F.2d at 301, and *Currie,* 609 F.2d at 1194, in reading *Raub* and *Kohl* as requiring a defendant to show actual bias or prejudice in these circumstances.[5] In the bias context, the impanelling of a juror properly challenged for implied bias is reversible error. *See, e.g., Gladhill v. General Motors Corp.,* 743 F.2d 1049, 1050–51 (4th Cir.1984), so holding because the challenged juror held stock in the defendant corporation. *Cf. Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), in which six justices voted to reverse a conviction based on a verdict rendered by a jury that was "illegal in its composition," *id.* at 501, 92 S.Ct. at 2168 (Marshall, Douglas & Stewart, JJ., concurring), over a dissent strongly arguing that the defendant had in no way been prejudiced by the illegality. *Id.* at 507, 92 S.Ct. at 2170 (Burger, C.J., joined by Blackmun & Rehnquist, JJ., dissenting).

Rule 33 gives the district court the power to grant a motion for new trial "in the interest of justice," Fed.R.Crim.P. 33, and the Supreme Court has noted that such post-verdict inquiries are proper so long as they are conducted within the strictures imposed by Fed.R.Evid. 606. *Tanner,* 483 U.S. at 127, 107 S.Ct. at 2751. The above discussion establishes that it would be er-

ror not to exclude a felon challenged for cause at *voir dire.* When the right to bring that challenge was not relinquished but rather abrogated by the felon's concealment, a new trial should be granted. I express no opinion on the possibly related subject of post-conviction relief under 28 U.S.C. § 2255, other than to note that the scope of such proceedings is obviously narrower than direct appeal, and that the "cause and prejudice" standard applicable in § 2255 actions does not allow relief from a non-constitutional flaw "unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.' " *United States v. Addonizio,* 442 U.S. 178, 184–85, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979), *quoting Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). I would hold only that when a felon, excludable under 28 U.S.C. § 1866(c)(4) pursuant to the determination made by Congress in enacting section 1865(b)(5), has concealed his status on *voir dire* and served on a jury in a criminal case, the verdict must be vacated when the error is discovered before entry of judgment. The remand to the district court should be for a hearing limited to the question whether the juror was, in fact, covered by the terms of section 1865.[6]

B. SENTENCING ON THE BASIS OF ACQUITTED CONDUCT

The jury convicted Holloman of distributing cocaine base—the .199 grams sold to

---

**5.** The state courts are split on the issue. *Compare Beasley v. State,* 39 Ala.App. 182, 96 So.2d 693 (1957); *Tweedle v. State,* 153 Tex.Crim. 200, 218 S.W.2d 846 (1949); *State v. Hermann,* 283 S.W.2d 617 (Mo.1955); *State v. Benson,* 235 Or. 291, 384 P.2d 208 (1963); *with State v. Ortega,* 77 N.M. 312, 422 P.2d 353 (1966). *See generally Firestone v. Freiling,* 22 Ohio Op.2d 356, 188 N.E.2d 91 (Ct.C.P.1963); *Stagg v. Stagg,* 96 Mont. 573, 32 P.2d 856 (1934); *Ex parte Bronson,* 158 Tex.Crim. 133, 254 S.W.2d 117 (1953).

**6.** The government in its Brief protests that there is no evidence that the juror's civil rights had *not* been restored. Brief for Appellee at 22. Though the formulation strikes me as somewhat inverted, the district court could address the issue on remand. As noted *supra* p. 642, the District of Columbia does not seem to have a formal procedure for the restoration of a felon's

civil rights. The Fourth Circuit has concluded that some "affirmative act" is required in order for civil rights to be restored within the meaning of § 1865(b)(5). *United States v. Hefner,* 842 F.2d 731, 732 (4th Cir.1988). I doubt the present case would present an occasion to resolve the question. The juror here was convicted on February 25, 1985, and sentenced to one year in jail with five years' probation. His probation therefore would not have expired until February 25, 1991 (or at the earliest February 25, 1990, if it ran concurrently). As noted *supra* p. 642, the D.C. jury statute renders the felon ineligible until one year after that date (February 25, 1992, or February 25, 1991). Defendants' trial was held in May of 1990, so this juror apparently would not have qualified under the D.C. statute, even if that were sufficient to satisfy the federal requirement.

the undercover officer. Calculating Holloman's offense level in light of the .199 grams alone would, under the Sentencing Guidelines, fix his term of imprisonment at 10–16 months. The court computed his sentence differently. Although the jury acquitted Holloman of the possession-with-intent-to-distribute count, which dealt with the 12.72 grams of cocaine base Boney threw under the truck, the district court found, by a preponderance of the evidence, that Holloman possessed that cocaine too, and treated it as "relevant conduct" under § 1B1.3(a)(2) of the Guidelines. (Holloman does not contest the factual accuracy of the district court's findings.) The district court therefore added the cocaine involved in the distribution and possession counts—a total of 12.92 grams—to determine Holloman's offense level. This increased the sentencing range to 63–78 months. The court sentenced Holloman to 63 months. Holloman understandably complains that, despite being acquitted of the possession charge, his sentence was no less than if he had been convicted. As he sees it, the Guidelines do not permit this; but if they do, they violate the Double Jeopardy and Due Process Clauses of the Fifth and Fourteenth Amendments.[7] The government tells us that other courts of appeals have approved what occurred here.

In determining the base offense level, the Guidelines instruct the sentencing court to take into account "relevant conduct," which for drug offenses means "all ... acts ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). The application notes to this section indicate that the Commission meant to include acts for which the defendant had not been convicted. U.S.S.G. § 1B1.3 application note 2; background commentary ¶ 3. The weight of drugs involved in uncharged criminal conduct and in conduct underlying dismissed counts may therefore be added to the amount of drugs involved in the charge on which the defendant was found guilty.

United States v. Salmon, 948 F.2d 776 (D.C.Cir.1991); see also United States v. Chaikin, 960 F.2d 171, 174 (D.C.Cir.1992); 1990 UNITED STATES SENTENCING COMMISSION ANNUAL REPORT 9, citing cases. The Guidelines do not specifically mention acts underlying counts on which a defendant has been acquitted. But the language of Guideline § 1B1.3(a)(2), particularly the "all," is certainly broad enough to comprehend such acts. Sentencing judges generally are not restricted in the kind of information they may take into account. "No limitation shall be placed on the information concerning the background, character, and conduct of a person ... for the purpose of imposing sentence." 18 U.S.C. § 3661.

When it comes to sentencing under the Guidelines, all circuits agree that the government may prove relevant conduct by a preponderance of the evidence, rather than beyond a reasonable doubt. See United States v. Burke, 888 F.2d 862, 869 (D.C.Cir. 1989); 1990 UNITED STATES SENTENCING COMMISSION ANNUAL REPORT 9. McMillan v. Pennsylvania, 477 U.S. 79, 91–92, 106 S.Ct. 2411, 2418–19, 91 L.Ed.2d 67 (1986), holds that this standard of proof at sentencing satisfies due process. A not guilty verdict establishes only that the government has not proved each element of the offense beyond a reasonable doubt. It does not rule out the possibility that, more likely than not, the defendant engaged in the conduct. See Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938); United States v. One Assortment of 89 Firearms, 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984); see also Dowling v. United States, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). As my colleagues point out, this difference between the standard of proof at trial and sentencing has moved ten courts of appeals to conclude that under the Guidelines, sentencing judges may consider "misconduct despite the defendant's acquittal on charges arising out of that misconduct." United States v. Fonner, 920 F.2d 1330,

---

7. I read Holloman's reference to the Fourteenth Amendment, by its terms not applicable to federal criminal trials, as an inelegant reference to

the demands of Due Process which do apply to such cases. U.S. CONST. AMEND. V.

1333 (7th Cir.1990). *See,* in addition to *Fonner, United States v. Coleman,* 947 F.2d 1424 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992); *United States v. Rivera–Lopez,* 928 F.2d 372 (11th Cir.1991) (per curiam); *United States v. Duncan,* 918 F.2d 647 (6th Cir.1990); *United States v. Rodriguez–Gonzalez,* 899 F.2d 177 (2d Cir.1990); *United States v. Dawn,* 897 F.2d 1444 (8th Cir.1990); *United States v. Mocciola,* 891 F.2d 13 (1st Cir.1989); *United States v. Isom,* 886 F.2d 736 (4th Cir.1989); *United States v. Ryan,* 866 F.2d 604 (3d Cir.1989); *United States v. Juarez–Ortega,* 866 F.2d 747 (5th Cir.1989). Six of these cases sustained enhancements to a sentence. Five of the six involved 2–level enhancements, pursuant to Guideline § 2D1.1, for possession of a firearm during an offense. *Coleman,* 947 F.2d at 1428–29; *Duncan,* 918 F.2d at 652; *Rodriguez–Gonzalez,* 899 F.2d at 180–81; *Dawn,* 897 F.2d at 1449–50; *Mocciola,* 891 F.2d at 16–17. The defendants in each case had been acquitted of using a firearm in connection with a drug offense, 18 U.S.C. § 924(c). *See, e.g., Rodriguez–Gonzalez,* 899 F.2d at 179. The sixth case, *Isom,* upheld a 6–level enhancement (pursuant to Guideline § 2B5.1(b)(2) for operating a printing press) for a defendant convicted of dealing with counterfeit obligations, 18 U.S.C. § 473, after he had been acquitted on a charge of counterfeiting, 18 U.S.C. § 371. 886 F.2d at 737, 739. Of the four remaining cases, two involved upward departures, *Ryan,* 866 F.2d at 608–09; *Fonner,* 920 F.2d at 1332. One of the others—like this case—involved aggregation of a separate quantity of cocaine charged in a count on which the jury returned a not guilty verdict. *Rivera–Lopez,* 928 F.2d 372. One did not specify which situation it faced. *Juarez–Ortega,* 866 F.2d at 748–49. The one court of appeals to break with this pattern, *United States v. Brady,* 928 F.2d 844, 851 (9th Cir.1991), did so over a dissent by Chief Judge Wallace,

*id.* at 855, and did not articulate any constitutionally-compelled reason for doing so. *Id.* at 852 n. 14. *But see United States v. Rodriguez,* 741 F.Supp. 12, 13–14 (D.D.C. 1990), *aff'd,* 946 F.2d 127 (D.C.Cir.1991) (table).

This widespread practice under the Guidelines comports generally with the system prevailing prior to the Guidelines. Judges in pre-Guidelines cases had "very broad discretion" to impose any sentence "within the statutory limits," and "could properly refer to ... evidence introduced with respect to crimes of which [a] defendant was acquitted." *United States v. Sweig,* 454 F.2d 181, 183–84 (2d Cir.1972). *See United States v. Funt,* 896 F.2d 1288, 1300 (11th Cir.1990); *United States v. Bernard,* 757 F.2d 1439, 1444 (4th Cir.1985); *United States ex rel. Goldberg v. Warden,* 622 F.2d 60 (3d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980); *United States v. Bowdach,* 561 F.2d 1160, 1175–76 (5th Cir.1977); *United States v. Cardi,* 519 F.2d 309, 314 (7th Cir.1975); *United States v. Atkins,* 480 F.2d 1223, 1224 (9th Cir.1973). This circuit had reached a similar result in at least one case, though it declined to adopt and follow *Sweig* to its ultimate limits. *United States v. Campbell,* 684 F.2d 141, 154 (D.C.Cir. 1982). Reviewing courts believed that a judge inevitably would be influenced by evidence he has heard already anyway. It seemed a better practice not to reverse a judge so influenced for candidly disclosing the reasons for the sentence. Pre–Guidelines courts also relied on the different standard of proof applicable at sentencing.

Although the Guidelines hedged in the courts' discretion to impose particular sentences, the Guidelines were intended to continue the practice of permitting sentencing courts to consider a wide array of information, *see* U.S.S.G. § 1B1.4; *see also* 18 U.S.C. § 3661.[8] Still, the statute creating the substantive offense of conviction sets the outer limit of permissible punishment.

---

**8.** Which reads:

No limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence. That section recodified 18 U.S.C. § 3577, enacted in 1970. *See* U.S.S.G. § 1B1.4 background.

U.S.S.G. § 5G1.1. *See United States v. Ryan*, 866 F.2d at 609; *United States v. Mocciola*, 891 F.2d at 16. *But cf. United States v. R.L.C.*, — U.S. —, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992). In this case, Holloman faced a statutory maximum of 20 years' imprisonment for the distribution count on which he was convicted. 21 U.S.C. § 841(b)(1)(C). If this were a pre-Guidelines case, the sentencing court could have chosen the appropriate sentence by considering Holloman's conduct underlying the possession count even though the jury returned a verdict of not guilty. With the Guidelines in place the difference is that the sentencing court *must* consider such conduct if proved by a preponderance of evidence, and must render a sentence within the range made applicable by the inclusion of that conduct, unless there is reason for a departure. To this extent, the effect of the Guidelines as I interpret them is the same as that described in *McMillan:* the statute there did not create "a separate offense calling for a separate penalty; it operate[d] solely to limit the ... court's discretion in selecting a penalty within the range already available to it," 477 U.S. at 84–87, 88, 106 S.Ct. at 2415–16, 2417.

Holloman argues that the Double Jeopardy Clause complicates the picture. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), extended the principle of *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969), that the Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal." Finding a collateral estoppel component in the Double Jeopardy Clause, *Ashe* held that the Constitution prohibited a second prosecution for a different offense if the government would have to offer proof on an issue regarding which the jury in the first prosecution "grounded its verdict" of not guilty. 397 U.S. at 444, 90 S.Ct. at 1194 (internal quotation omitted). In this case the district court told the jury that the elements of the possession-with-intent-to-distribute offense were knowing possession of some type of controlled substance, quantity,[9] and a specific intent to distribute. 5/9/90 Tr. at 93–95. The court also instructed on both constructive possession and joint possession. *Id.* at 94. By convicting Boney on this count (but not Holloman), the jury demonstrated its belief that the stash found under the truck was of the necessary quantity and was not for personal use. "The jury could [not] rationally have found" that this stash of 12.72 grams of cocaine base was not for Boney's personal use but was for Holloman's. 397 U.S. at 445, 90 S.Ct. at 1195. Thus, if the verdict on this count was dictated at all by the evidence in the case, it could only have rested on a conclusion that Holloman did not possess the "stash."[10] Were the government to try Holloman tomorrow for any offense which included as an element possession of the stash, *Ashe* would bar its way. Holloman says that considering his possession of the stash as "relevant conduct" amounts to punishing him for something for which he was acquitted, which, he asserts, *Ashe* prohibits.

In light of the overwhelming agreement of the courts of appeals before and after the Guidelines, and the absence of any contrary indication from the Supreme Court, I agree that § 1B1.3(a)(2) of the Guidelines is not unconstitutional when applied in this manner. Holloman's argument entails the minor premise that a defendant may be punished only for conduct of which the defendant has been found guilty beyond a reasonable doubt. If "punishment" means "plays any role in the setting of a sentence," *McMillan* puts the argument to rest—it allows sentences to be adjusted based on facts not proven at trial. 477 U.S. at 91–92, 106 S.Ct. at 2418–19. The distinction seems to be that the defendant is not being sentenced for the acquitted

---

9. This court has since made clear that the quantity of the drugs involved is relevant only to sentencing and is not an issue for the jury. *United States v. Patrick*, 959 F.2d 991, 996 n. 5 (D.C.Cir.1992). That does not resolve this case, for the dispute here is over *which* quantity of

drugs Holloman may be sentenced for (*i.e.*, only the drugs he sold or also the drugs Boney held), not over weight.

10. The district court judge did not agree with that verdict. 11/21/90 Tr. at 12–13.

conduct. Rather, the constitutionally-permissible sentencing range is set by the statute defining the offense of which the defendant was convicted, while the actual sentence within that range is determined in part by reference to other information establishing, by a preponderance of the evidence, the defendant's involvement in other relevant conduct.

I recognize that this conceptual nicety might be lost on a person who, like Holloman, breathes a sigh of relief when the not guilty verdict is announced without realizing that his term of imprisonment may nevertheless be "increased" if, at sentencing, the court finds him responsible for the same misconduct. That the Double Jeopardy Clause protects him from reprosecution on the acquitted count, or that his acquittal means that his maximum potential sentence will be determined solely on the basis of the count on which he was convicted is doubtless of little comfort. My analysis, and my colleagues', also rests somewhat uneasily with the "special weight" the Supreme Court has accorded acquittals in its Double Jeopardy jurisprudence. *See United States v. DiFrancesco*, 449 U.S. 117, 129–30, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980), collecting cases; *see also Ex parte Lange*, 85 U.S. (18 Wall.) 163, 173, 21 L.Ed. 872 (1874). If, as one commentator has suggested, and as the Court has indicated, *DiFrancesco*, 449 U.S. at 130 n. 11, 101 S.Ct. at 433 n. 11, not guilty verdicts are given this special weight out of respect for the jury's prerogative to acquit in the teeth of overwhelming evidence of guilt, Westen, *The Three Faces of Double Jeopardy: Reflections on Government Appeals of Criminal Sentences*, 78 MICH.L.REV. 1001, 1012–18 (1980); Westen & Drubel, *Toward A General Theory of Double Jeopardy*, 1978 SUP.CT.REV. 81, 122–31, then the Guidelines' formalizing the potential use of acquitted conduct in sentencing may have worked a significant erosion of the jury's dispensing power. On the other hand, the Court seems to have indicated that when an aspect of a verdict speaks only to the sentence a defendant may receive, and leaves open the question of guilt, the Double Jeopardy Clause does not limit the sentencing range available at a subsequent trial. *Cichos v. Indiana*, 385 U.S. 76, 87 S.Ct. 271, 17 L.Ed.2d 175 (1966); *see also* Westen, *supra*, 78 MICH.L.REV. at 1021–22 & n. 66.

At any rate, I cannot disregard the Court's decision in *McMillan*, its broader implications, and the accumulated weight of twenty years' decisions from our sister circuits. The Guidelines clearly require, and *McMillan* clearly allows, sentencing courts to take account of uncharged conduct proven by a preponderance of the evidence. To bar the sentencing court from considering acquitted conduct that also can be so proven would be anomalous. The Supreme Court has never held, indeed so far as I am aware no appellate court has ever held, that the Double Jeopardy Clause forbids sentencing courts from looking at conduct underlying an offense on which the defendant was acquitted. The hard logic of the differing-burdens-of-proof analysis has been accepted by the Supreme Court in other contexts, as well as by ten other courts of appeals in this context. *See supra* p. 645. I agree that we should not reject it today, and so join the majority's holding that the use of conduct underlying an acquitted count as "relevant conduct" under § 1B1.3(a)(2) for purposes of sentencing does not violate the Double Jeopardy Clause.